RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
NISHA BROOKS-WHITTINGTON
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
Nisha_Brooks-Whittington@fd.org

Attorney for Alexander Scott Derringer

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>ALEXANDER SCOTT DERRINGER<br><br>          Defendant. | Case No. 2:23-cr-00039-JCM-NJK<br><br>**MR. DERRINGER'S**<br>**SENTENCING MEMORANDUM[1]** |

Mr. Derringer, by and through his counsel of record, Assistant Federal Public Defender, Nisha Brooks-Whittington, submits this sentencing memorandum in support of a sentence of 60 months, which is "sufficient, but not greater than necessary" to meet the sentencing goals outlined in 18 U.S.C. § 3553(a)(2). DATED this 23rd day of September 2024.

RENE L. VALLADARES
Federal Public Defender

*/s/ Nisha Brooks-Whittington*

NISHA BROOKS-WHITTINGTON
Assistant Federal Public Defender
Attorney for Alexander Scott Derringer

---

[1] Certification: This Sentencing Memorandum is timely filed.

## I.   THE GOVERNMENT, PROBATION, AND THE DEFENSE AGREE A SENTENCE BELOW THE ADVISORY GUIDELINE RANGE IS APPROPRIATE IN THIS CASE.

The Presentence Investigation Report lists the advisory guideline range as 151-188 months,[2] but a sentence within that range is inappropriate and would fail to meet the goals of sentencing.  The government, the United States Probation Office, and the defense agree that a sentence below the advisory guidelines range is appropriate.

### A.   The probation office recommends a sentence of 120-months.

The PSR identifies factors that may warrant a sentence outside of the advisory guideline range.  Specifically, the PSR noted that Mr. Derringer received a two-level increase for use of a computer during the instant offense and a five-level increase as the offense involved 600 or more images.[3]  According to probation, "nearly all cases involving the possession, receipt, and distribution of child pornography charged under 18 USC § 2252A involve the use of a computer."[4]  Additionally, due to advances in technology, numerous images can be downloaded in a matter of minutes; therefore these enhancements may unduly increase the recommended sentencing range based on their ubiquitous application in almost all cases with guidelines being calculated under USSG § 2G2.G."[5]  The PSR notes that the United States Sentencing Commission has examined these enhancements in its 2021 report.[6]

---

[2] PSR ¶ 87.

[3] PSR ¶ 104.

[4] *Id.*

[5] *Id.*

[6] *Id.*

2

The PSR advises that without the two enhancements (i.e. use of computer and number of images), Mr. Derringer's guideline range would be 70 to 87 months based on a total offense level of 27 and a criminal history category I.[7]  With this range in mind, the PSR recommends a downward variance to 120-months imprisonment.[8]

### B.   The government will request a sentence below the advisory guidelines range.

Under the terms of the plea agreement, the government will request a three-level downward variance and a sentence at the low-end of the advisory guideline range.[9]  After applying this three-level variance, the total offense level would be 31 and with a criminal history category I, the resulting guideline range would be 108-135 months.  The government will likely recommend a sentence of 108-months.

### C.   Mr. Derringer requests a sentence of 60-months imprisonment because it is consistent with the goals of sentencing.

While both the government and probation recommend a downward variance, the sentences they request is greater than necessary and fails to account for the other flawed sentencing enhancements that unduly increases Mr. Derringer's guideline range and the unique factors of his case.

A 60-month sentence is sufficient but not greater than necessary for several reasons.  First, U.S.S.G. § 2G2.2 is flawed as it is not empirically based and the enhancements applied in this case apply in most cases as they fail to adequately distinguish between offenders.  Second, Mr. Derringer's lack of a criminal history, strong ties to the community, and compliance for the past 18 months and 27 days

---

[7] PSR ¶ 104.

[88] *Id*. at p.21.

[9] Plea Agreement, ECF No. 32 at 12.

under pretrial services supervision.    Third, a sentence of 60-months is the statutory mandatory minimum for the underlying offense and adequately addresses the remaining sentencing factors under 3553(a).

> **1.    The nature and circumstances of the offense combined with Mr. Derringer's history and characteristics weigh in favor of a 60-month sentence.**

Mr. Derringer's life took a turn for the worst during an unprecedented time in our nation's history: the global pandemic.  He was going through a stressful period in his life as he was already having difficulties at work and with making friends.  The pandemic made this even more difficult due to the forced isolation he (and others in this country) found himself in.  He had to stay at home and had to learn how to manage his work from there.  During this time, he thought he could make friends through a messenger application called KIK.  He interacted with lots of people and was exposed to all kinds of things on KIK including child pornography (CP).  Mr. Derringer ultimately viewed and shared approximately 130 child pornography files through KIK.[10]  He also had CP images and videos on his phones.[11]  Mr. Derringer is ashamed of his actions.

Mr. Derringer knows that his conduct was wrong.  He knows that the images and videos he received, watched, and shared with others re-victimized the victims.  He is remorseful as he knows that the children in the images and videos were abused.

Mr. Derringer's actions in this offense while serious did not go beyond viewing and sharing child pornography.  He did not produce child pornography and committed no type of hands-on offense.  He has no excuse for his conduct and takes

---

[10] Plea Agreement, ECF No. 32 at 8-9.

[11] *Id.*

4

full responsibility for his actions.[12]   When he was arrested for this offense, Mr. Derringer was shameful and did not admit his wrongdoing.  But he has since taken full accountability which is demonstrated by his change of plea from not guilty to guilty for distribution of CP and his waiver of constitutional and appellate rights.[13]

Prior to his conduct in this case, Mr. Derringer had never been arrested.[14] He has been a law-abiding citizen for most of his life.  This is unsurprising considering Mr. Derringer grew up in a home with both parents and a younger brother where support and love were the norm.[15]  His family was religious and his parents were missionaries.  Although they were poor when he was younger, the family's socioeconomic status improved when they moved to Las Vegas.

However, Mr. Derringer's transition in the Las Vegas community was difficult.  At school, he had trouble making friends and was constantly bullied.[16] Bullying likely came because of Mr. Derringer's speech impediment and other learning struggles.  He worked hard to overcome his difficulties and became active in Boy Scouts, baseball, karate, and his church's youth group. Outside of these activities, Mr. Derringer spent a lot of time at home caring for his mother.  His mother suffers from osteogenesis, a genetic bone disorder, which requires her to use a wheelchair and crutches.[17]

---

[12] Exhibit A

[13] Plea Agreement, ECF No. 32 at 13-14.

[14] PSR ¶¶ 42-44 (noting Mr. Derringer received citations for minor traffic related incidents in lieu of arrest).

[15] *See* PSR ¶ 53, 55

[16] PSR ¶ 55.

[17] PSR ¶ 55.

Like his mother and father, Mr. Derringer gave back to his community by participating in a missionary for his church from October 2013 through April 2014.[18] He traveled to Cambodia where he shared information about his faith, provided services to the community, and shared the gospel. Mr. Derringer enjoyed this experience of giving back and supporting a community. Unfortunately, he did encounter a traumatic experience in Cambodia when he was assaulted by a local man.[19]

Mr. Derringer returned to the United States and later met his spouse in 2015. The couple enjoyed a healthy and loving relationship. They expanded their family in 2016 by welcoming their daughter. Their daughter is autistic and struggles to communicate verbally. Mr. Derringer is an involved father as he attends her appointments and assists in her development. In fact, his daughter depends on his physical presence for her emotional stability and safety.[20]

In addition to being a loving father, Mr. Derringer works hard to financially support his family. He has maintained employment over the years as a teacher, cashier, and shelf stocker.[21] Mr. Derringer is currently employed as a shelf stocker and has maintained this employed for over one year.

Mr. Derringer's life has been filed with highs and lows but his history shows he is kind, helpful to others including his community, is a hard worker, and a caring father. These attributes are known by his family members.

---

[18] *Id.* at 56.

[19] *Id.*

[20] Exhibit B

[21] *See* PSR ¶ 74-82.

Mr. Derringer's parents says that he has "always been a kind and gentle person and has never before been in trouble of any kind."[22]  They share that "[h]e is a hard worker and has consistently held a job from the time he was 17 to the present."[23]  Mr. Derringer is "a devoted husband and a great father to his daughter."[24] While his parents recognize the severity of his offense, they share that "[t]hrough this unfortunate incident [we] have seen him show great remorse."[25] His parents explain "[h]e has a strong support system, and we are dedicated to assuring his success throughout his incarceration and upon return to society as well as providing him with a place to live and financial support until he is able to obtain a job."[26]

Like his parents, Mr. Derringer's ex-wife explains that he is a "dedicated and loving father" to their daughter.[27]  That Mr. Derringer's "caring and patient nature [with their daughter has] been instrumental in helping her grow and make progress in areas that are often challenging for children with autism."[28] As result of his relationship with their daughter, she has "learned to talk more, and her anxiety diminishes when he is around." [29] His ex-wife believes that Mr. Derringer's "compassion and dedication to helping those in need" is exemplified in his missionary work in Cambodia.[30]  She continues to support Mr. Derringer.

---

[22] Exhibit C

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Exhibit B.

[28] *Id.*

[29] Exhibit B.

[30] *Id.*

Mr. Derringer's friend of eight years also attests to his kindness, hardworking nature, and role as a father.[31]  Mr. Smith says that Mr. Derringer is the "most dedicated, hardworking, and generous individual I have ever known."  [32] He "consistently gives more than is what expected or required."[33]  Mr. Smith believes that Mr. Derringer "is a devoted father, a loyal friend, and a person who always puts the needs of others first."  [34]

Mr. Derringer has a strong network of family and friends that know him well and believe his actions were aberrant conduct and that he is working to better himself.  This network of family and friends will continue to be in his corner upon his release from custody.

Mr. Derringer knows that his actions have significantly impacted him and his family.  And, he recognizes that he will be away from his family for a period of time but when he returns, he will return to the law-abiding lifestyle he previously led as his history and characteristics support it.

Mr. Derringer's past employment history is further evidence that he can get his life back on track.  Mr. Derringer is a hard worker and strived to provide for himself and financially assist his family.  He will continue to do so while in prison and when he is released.

Mr. Derringer's history and characteristics combined with the nature and circumstances of the offense supports a 60-month sentence—still an extraordinary sentence, particularly for an individual who has never served a term of incarceration and who has led an otherwise law-abiding life.

---

[31] Exhibit D.

[32] *Id.*

[33] *Id.*

[34] *Id.*

8

### 2.   Respect for the law, just punishment and deterrence to criminal conduct.

Regarding promoting respect for the law and providing just punishment, "[r]espect for the law is promoted by punishments that are *fair* . . . not those that simply punish for punishment's sake. There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist."[35]   A sentence of 60-months will be the longest sentence Mr. Derringer has ever served considering he has never been sentenced to jail or prison before.  Additionally, this will be Mr. Derringer's first felony conviction and the stigma of a felony conviction will forever change his life.  A sentence of 60-months is appropriate considering the circumstances of the offense and is just punishment to reflect respect for the law and to deter future criminal conduct.

### 3.   Protection of the public.

Mr. Derringer is not a danger to the community.  He has been at liberty since his release on a personal recognizance bond on March 3, 2023, and has been compliant with his conditions of release.[36]

Imposing a sentence of 60-months adequately protects the public. Additional incarceration is unnecessary to protect the public.  Mr. Derringer stands before this Court a 38-year-old man.  After serving a 60-month sentence, he will be 43-years-old.  At that age, he will be entering a phase of life when the risk factors for recidivism will begin to dissipate. *See United States v. Smith*, 756 F.3d

---

[35] *United States. v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008) (sentencing possession of child pornography defendant to twelve months and one day imprisonment.).

[36] PSR ¶ 9.

9

1179, 1183 (10th Cir. 2014) (Gorsuch, J.) (recognizing that "the marginal benefit for public protection" in a lengthy sentence inversely correlates with the age of projected release); *United States v. Presley*, 790 F.3d 699, 702 (7th Cir. 2015) as corrected (June 17, 2015) ("Sentencing judges need to consider the phenomenon of aging out of risky occupations."). In 2004, the Commission released a report entitled *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*. According to this study, recidivism rates decline consistently as age increases. The recidivism rate for Criminal History Category I individuals who are 38 years old, like Mr. Derringer, at the time of sentencing, is 12.1%.[37]

A 10-year term of supervised release after a 60-month sentence will adequately ensure the protection of the public. Courts order supervised release to "in part prevent further crimes thereby protecting the public against the risk of recidivism."[38]

Furthermore, Mr. Derringer must report as a sex offender, which serves as an additional check on him. 10 years of supervised release, after a 60-month prison term, is a significant amount of time to serve the goals of protecting the public.

### 4.   Disparities.

Title 18, Section 3553(a)(6) states the Court should avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Most child pornography cases result in below guideline

---

[37] *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, Exhibit 9,* available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2004/200405_Recidivism_Criminal_History.pdf

[38] *United States v. Kebodeaux*, 133 S. Ct. 2496, 2504 (2013) (noting that the "principal purposes of postrelease conditions are to rehabilitate the convict, thus preventing him from recidivating, and to protect the public.").

10

sentences and federal judges, academics and attorneys increasingly publicly express concern at the severity of the sentencing scheme.  According to a survey conducted by the United States Sentencing Commission, federal judges believe that many child pornography sentences are too long—71 percent of respondents believed that the mandatory minimum for receipt of child pornography was too high.[39]  The same holds true for guideline sentences, with 70 percent of the judges surveyed responding that the guideline ranges for possession were too high.

A 60-month sentence would in no way be an anomaly, as the data shows a national trend of significant variances.[40]  Courts in this district are following that national trend.[41]

These are just a few examples of judges in this district granting substantial child pornography variances:

- Judge Dorsey sentenced Richard Dittmer (2:18CR302) to 64 months.  His guideline range was 121-151.

- Judge Du sentenced Douglas Miller (3:19CR57) to 70 months.  His guideline range was 121-151.

---

[39] U.S. Sentencing Commission, *Results of Survey of United States District Judges, January 2010 through March 2010 Question 1* (June 2010), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/surveys/20100608_Judge_Survey.pdf.

[40] The USSC statistics for 2018 reflect that 61.2% of all child pornography cases received a sentence reduction by way of variances with the average sentence reduction of 40.1%. Alternatively, only 28.4% of defendants convicted of a child pornography offense received a sentence within the guideline range. *See* USSC Fiscal Year 2014 through Fiscal Year (FY) 2018 Datafiles.

[41] Of the 1,368 cases involving child pornography reported for FY 2019, 59.9% received a variance in their case. There were 27 documented cases of child pornography sentenced in the District of Nevada, of which 44.4% received a variance. Therefore, the trend of sentencing variances for child pornography offenses continued into FY 2019. *See* USSC Statical Information Packet, District of Nevada, FY 2019.

11

- Judge Navarro sentenced Jamie Mendoza (2:19CR262) to 36 months. His guideline range was 97-121 months.

- Judge Du sentenced Austin Finigan (3:19CR53) to time served. His guidelines range was 78-97 months.

- Judge Du sentenced Randall Linscheid (3:19CR36) to 36 months. His guideline range was 78-97 months

- Judge Du sentenced Edward Wright (3:19CR12) to 57 months. His guideline range was 110-137 months.

- This Court sentenced Dustin Randall (2:18CR303) to 96 months. His guideline range was 210-262 months.

- Judge Boulware sentenced Christopher Hawk (2:20CR175) to 60 months. His guideline range was 151 to 181 months.

> **5.    This court should exercise its discretion to vary downward based on a reasonable policy disagreement with the flawed child pornography guidelines.**

The child pornography guidelines are critically flawed. They are not the product of United States Sentencing Commission's expertise, empirical data, or experience. The child pornography guidelines contain several enhancements that apply in almost every case, pushing the guideline range for most offenders of differing culpability and to provide proportional punishment. Additionally, these guidelines fail to differentiate between offenders of differing culpability, resulting in a failure to provide proportional punishment. As a result, they have been rejected by courts, academics, and the Sentencing Commission itself.

The Supreme Court in *United States v. Kimbrough* recognized a sentencing court's authority to vary from the Guidelines based solely on a reasonable policy disagreement with a particular guideline.[42]   In doing so, the Supreme Court

---

[42] *Kimbrough v. United States*, 552 U.S. 85, 102 (2007).

12

recognized that the Sentencing Commission "fills an important institutional role: it has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise."[43] Thus, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that *might* achieve § 3553(a)'s sentencing objectives."[44]

But the crack-cocaine guidelines, at issue in *Kimbrough*, did "not exemplify the Commission's exercise of its characteristic institutional role" because it was the product of harsh congressional directives rather than empirical data and national experience.[45] The result, which the Commission itself acknowledged, was disproportionately harsh sanctions, i.e., sentences for crack-cocaine offenses "greater than necessary" in light of the § 3553(a) sentencing purposes.[46] The Supreme Court therefore held that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence greater than necessary to achieve 3553(a)'s purposes, even in a mine-run case."[47]

In *United States v. Henderson*, the Ninth Circuit considered a sentencing court's *Kimbrough* discretion as to the child-pornography guidelines.[48] Reasoning that, "like the crack-cocaine Guidelines at issue in *Kimbrough*," the child-pornography guideline was "not developed in a manner exemplify[ing] the

---

[43] *Id*. at 108-09.

[44] *Id.* at 109 (internal citations and quotation marks omitted) (emphasis added).

[45] *Id.* at 110.

[46] *Id.*

[47] *Id.*

[48] 649 F.3d 955 (2017).

13

[Sentencing] Commission's exercise of its characteristic institutional role,"[49] the Court held that district courts may vary from § 2G2.2 "based solely on policy disagreement" with it and "not simply based on an individualized determination that [it yields] an excessive sentence in a particular case."[50]

Here, Mr. Derringer's base offense level is 22 and with just a two-level enhancement for distribution, his total offense level would be 24.  With a reduction for acceptance of responsibility, his offense level falls to 21, producing a guideline range of 37-46 months (given Mr. Derringer's criminal history category score of I). The other applicable enhancements raise his offense level by 13 levels, shooting his guideline range up to 151 - 188 months, over a nine-year difference.  These enhancements apply not because of anything in particular in Mr. Derringer's case, but rather are products of factors that appear in almost every case yet raise his guidelines by more than nine-years.  This increase is particularly troubling given that the applicable enhancements are unmoored from support in either policy or research.

### a.    The child pornography guidelines are not the product of the sentencing commission's institutional expertise or empirical data.

The development of the child pornography guidelines was unusual.  They were not formulated by the Sentencing Commission in the exercise of its institutional expertise.  Rather, these guidelines were "developed largely pursuant to congressional directives."[51]   "To say that the final product is the result of Commission data, study, and expertise simply ignores the facts."[52]

---

[49] *Id.* at 960 (internal citations and quotation marks omitted).

[50] *Id.* at 964.

[51] *United States v. Helton*, 783 F.3d 148, 158 (4th Cir. 2015) (Gregory, J. concurring) (quoting *United States v. Grober*, 624 F.3d 592, 608 (3d Cir. 2010)).

[52] *Grober*, 624 F.3d at 608 (internal quotation omitted).

14

In 2009, the Sentencing Commission issued a report outlining the history of the child pornography sentencing guideline.  The Commission explained: "Through creating new offenses, enacting new mandatory minimums, increasing statutory maximums, and providing directives to the Commission, Congress has repeatedly expressed its will regarding appropriate penalties for child pornography offenders."[53]  In this report, the Commission discussed the reforms to the guideline made in 1988, 1990, 1991, 1996, 2000, 2003, 2004, and 2009.  Each reform has had the same effect—to increase penalties for those charged with child pornography offenses.[54]

The Commission has strongly and consistently opposed these statutory changes. In 1991, as Congress was contemplating a directive to increase the base offense level for receipt and possession offenses, the Chair of the Commission informed Congress that such action "would negate the Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness" and would instead "require the Commission to rewrite the guidelines for these offenses in a manner that reintroduce sentencing disparity among similar defendants."[55] Later, in 1996, the Commission criticized the two-level computer enhancement because it failed to distinguish serious commercial distributors of online pornography from run-of-the-mill users.[56]

_____

[53] United States Sentencing Commission, *The History of the Child Pornography Guidelines* at 6 (2009), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sexoffenses/20091030_History_Child_Pornography_Guidelines.pdf.

[54] *See United States v. R.V.*, 157 F. Supp. 3d 207, 258 (E.D.N.Y. 2016) ("The Commission opposed increasingly harsher penalties imposed by the legislature.").

[55] *United States v. Dorvee*, 616 F.3d 174, 185 (2d Cir. 2010).

[56] *Id.* at 186.

15

Congress was arguably most heavy handed in its revisions to the child pornography guidelines in its passage of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act ("PROTECT Act"). The PROTECT Act "created a five-year mandatory minimum for trafficking and receipt, raised the statutory maximum for trafficking and receipt from 15 to 20 years and for possession from five to ten years, and amended the prefatory language of 28 U.S.C. § 994(a)(1), which enumerates the duties of the Commission, to require that guidelines be 'consistent with all pertinent provisions of any Federal statute.'"[57]

Most unusually, the PROTECT Act "contained provisions by which Congress, for the first and only time to date, directly amended the guidelines."[58] The specific enhancements enumerated in the PROTECT Act included (1) an enhancement for the number of images, increasing offense conduct up to five levels; and, (2) a four level enhancement for materials that portray "sadistic or masochistic content."[59]  These enhancements, which involved zero input from the Sentencing Commission, resulted in a *nine-level* increase for the vast majority of individuals charged with child pornography offenses.[60]

---

[57] *The History of the Child Pornography Guidelines* at 38.

[58] *Id.*

[59] *Id.* at 39.

[60] Alan Vinegrad, the former United States Attorney for the Eastern District of New York, opined that the PROTECT Act showed a "blatant" disregard for the Commission and was "the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress."). *See Dorvee,* at 185.

16

**b.**   **Many of the child pornography enhancements apply in every case, resulting in significantly higher sentences that fail to differentiate between offenders.**

The Guidelines not only enumerate an increasingly long list of potential enhancements but also outline a number that apply to virtually all individuals charged with a child pornography offense.  According to the Commission, "four of the six enhancements in § 2G2.2(b)—together accounting for 13 offense levels— now apply to the typical non-production offender." [61]  The Commission found that, in fiscal year 2010, "§ 2G2.2(b)(2) (images depicting prepubescent minors) applied in 96.1 percent of cases; § 2G2.2(b)(4) (sadomasochistic images) applied in 74.2 percent of cases; § 2G2.2(b)(6) (use of a computer) applied in 96.2 percent of cases; and §2G2.2(b)(7) (images table) applied in 96.9 percent of cases."[62] As a result, "most of [these] enhancements are essentially inherent in the crime." [63]

These additional 13 offense levels add significantly more prison time to sentences.  In Mr. Derringer's case, as noted above, those 13 levels change his sentence from 37-46 months to 151-188 months, a nearly ten year difference.  The overall effect on child pornography sentencing can also be seen in national averages.  The average guideline minimum for non-production child pornography offenses in fiscal year 2004—the last full fiscal year when the guideline were mandatory and the first full fiscal year after the enactment of the PROTECT Act—

---

[61] United States Sentencing Commission, Report to the Congress: *Federal Child Pornography Offenses*, Chapter 12: Findings, Conclusions and Recommendation to Congress 316 (2012) (hereinafter "Commission Child Pornography Report"), available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Chapter_12.pdf.

[62] *Id.*

[63] *Grober*, 624 F.3d at 597.

17

was 50.1 months of imprisonment, and the average sentence was 53.7 months.  By fiscal year 2010, as the PROTECTE Act affected a larger percentage of cases, the average guideline minimum was 117.5 months of imprisonment, and the average sentence imposed was 95.0 months.[64]  Going back to the inception of the Guidelines in 1987, the inflation in sentences is even more dramatic.  Simple possession of child pornography was not even a crime then and the base offense level for transporting, receiving or trafficking in child pornography was 13. [65]

The ubiquitous application of these enhancements results in guideline ranges that fail to distinguish between offenders of differing culpability.  In the words of the Sentencing Commission, "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders.[66]  The Commission has also concluded that "[s]everal provisions in the current sentencing guidelines for non-production offenses—in particular, the existing enhancements for the nature and volume of the images possessed, an offender's use of a computer, and

---

[64] United States Sentencing Commission, Report to the Congress: *Federal Child Pornography Offenses*, Chapter 12: Findings, Conclusions and Recommendation to Congress 315 (2012) (hereinafter "Commission Child Pornography Report"), available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Chapter_12.pdf.

[65] *See* U.S.S.G. § 2G.2 (1987).

[66] United States Sentencing Commission, Report to the Congress: *Federal Child Pornography Offenses*, Chapter 12: Findings, Conclusions and Recommendation to Congress 316 (2012) (hereinafter "Commission Child Pornography Report"), available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Chapter_12.pdf.

distribution of images—originally were promulgated in an earlier technological era" and are now outdated as measures of offense severity.[67]

### c. Courts, academics, and the sentencing commissioners themselves have consistently rejected the current child pornography guidelines.

#### (1) Courts unequivocally criticize the child pornography guidelines.

Courts have criticized and rejected the child pornography sentencing guidelines with increasing unanimity.[68]  According to a survey conducted by the Sentencing Commission, 71 of responding federal judges believe that the mandatory minimum for receipt of child pornography is too high.[69] The same holds true for simple possession guidelines sentences, with 70% of the judges surveyed responding that the guideline ranges for possession were too high.  Additionally, 69 believed that sentences for receipt of child pornography were excessive. [70]

As a result, courts are far more likely to impose a sentence substantially below the range called for by § 2G2.2 than to impose a sentence within it.[71]  For 2019, the Commission found that approximately 67% received a sentence below

---

[67] *Id.*

[68] *See, e.g., Dorvee*, 616 F.3d at 185; *Grober*, 624 F.3d at 603 (collecting cases).

[69] United States Sentencing Commission, *Results of Survey of United States District Judges*, January 2010 Through March 2010 Question 1 (June 2010).

[70] *Id.* at Question 8.

[71] *See* United States Sentencing Commission, 2019 Interactive Sourcebook of Federal Statistics, Table 31 (reflecting that almost 70 of child pornography are below the guideline range) ("2019 Interactive Sourcebook"), Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table31.pdf.

the guideline range.[72]  Not only is the rate of variance in child pornography cases striking, so too is the degree of the variance.  Nationwide the mean decrease from the applicable guideline minimum was 40.5%.[73]

These figures reflect an emerging consensus among courts not just that the sentences called for by the pornography guidelines are too high but that they are *substantially* too high; too high by matters of years, even decades.[74]

### (2)    Academics lambast the child pornography guidelines.

Academics who have researched the history and operation of the child pornography guidelines have affirmed that they neither reflect the expertise of the Commission nor empirical evidence.[75]  For example, Alan Vinegrad, the former United States Attorney for the Eastern District of New York observed that the changes to the Guidelines mandated by the PROTECT Act of 2003 evince a "blatant" disregard for the Commission and are "the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress."[76]

---

[72]  2019 Interactive Sourcebook, Table 31.  Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table31.pdf.

[73]  2019 Interactive Sourcebook, Table 40.  Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table40.pdf.

[74]  *See e.g., Grober*, 624 F.3d at 599, 611 (affirming variance that reduced sentence from range of 235-293 months to five years).

[75]  *See* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (2009), available at http://www.1b7.uscourts.gov/documents/INND/110CR40.pdf.

[76]  Alan Vinegrad, *The New Federal Sentencing Law*, 15 Fed. Sent. R. 310, 315 (June 2003).

In 2012, law professor Melissa Hamilton published a scathing review of federal child pornography laws, comparing law enforcement's approach to child pornography to the war on drugs. Hamilton writes that "[i]n the drug war, the United States wages battle without much differentiation among producers, importers, distributors, or users" and that, "[f]or this reason, the drug war is widely considered an abject failure, costing billions of dollars and contributing to prison overcrowding without substantially reducing demand."[77] In explaining the comparison to child pornography laws, Hamilton writes:

> The analogy here is that the war on child sexual abuse snares the more easily identifiable child pornography downloaders and traders, thereby attracting law enforcement resources to these offenders. Yet there is little or no evidence that this approach has yielded the expected deterrence value or has succeeded in protecting children. In fact, potential long-term negative consequences are probable. Where law enforcement initiatives have taken on a child pornography-centric approach, the campaign against child sexual exploitation has lost sight of what should be the primary interest: protecting actual children from sexual abuse. As child pornography consumers are not the high-risk offenders they are presumed to be, resources are misdirected at imprisoning scores of defendants who do not pose a risk of future harm. Policy-makers would seem to have an incentive to allow more rational minds to prevail.[78]

### (3)   The Sentencing Commission abhors the child pornography guidelines.

Perhaps most tellingly, the Sentencing Commission itself rejects the child pornography guidelines. After conducting a thorough study in 2012, the Sentencing Commission found, among other things, that: (1) these guidelines fail to provide proportional punishment; (2) they produce unwarranted disparities

---

[77] Melissa Hamilton, The Child Pornography Crusade and Its New-Widening Effect, 33 Cardozo L.Rev. 1679, 1726-27 (2012).

[78] Id. at 1727.

21

among offenders; and (3) many of their enhancements are outmoded and counterproductive.[79] Accordingly, it has concluded that the child pornography guidelines require massive revision and restructuring and has asked Congress for permission to do so.[80]

The Sentencing Commission continues to echo these same sentiments and noted in its June 2021 report, *Federal Sentencing of Child Pornography: Non-Production Offense*, that because enhancements that initially were intended to target more serious and more culpable offenders apply in most cases, the average guideline minimum and average sentence imposed for non-production child pornography offenses have increased since 2005.[81]  The Commission further found that "[a]lthough sentences imposed remain lengthy, courts increasingly apply downward variances in response to the high guideline ranges that apply to the typical non-production pornography offender."[82]

The Sentencing Commission's reports show reason and logic are not the source of the child pornography guidelines.  Rather, politics are the source—it is clear that Congress sees how constituents most who are not versed in the intricacies of our legal system, would rebel against any real effort to combat unjust sentences in child pornography cases.  Yet, political considerations are not one of the 18 U.S.C. § 3553(a) factors this Court must consider.  Thus, the child pornography guidelines are ill-suited to champion the policies this Court must consider.

---

[79] *Commission Child Pornography Report* at 311-31.

[80] *Id.*

[81] United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* at 5, Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.

[82] *Id.*

22

1
2
3
4
5

If this Court agrees with the Ninth Circuit,[83] the Sentencing Commission[84] and several circuit courts that "most of [these] enhancements are essentially inherent in the crime,"[85] this Court may vary from § 2G2.2 "based solely on policy disagreement" with it and "not simply based on an individualized determination that [it yields] an excessive sentence in a particular case."[86]

6
7

Considering the flaws in the child pornography guideline, this Court should vary downward and sentence Mr. Derringer to a term of 60-months.

8
9

## II.    THIS COURT SHOULD IMPOSE A 10-YEAR TERM OF SUPERVISED RELEASE TO FOLLOW.

10
11
12
13
14
15
16
17

A 10-year term of supervised release is a significant period that will accomplish the goals of sentencing. A sentence, including a supervised release term, is substantively unreasonable when it is "greater than necessary to accomplish" the statutory goals of sentencing. These goals include the need to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment."[87]

18
19
20

Here, Mr. Derringer will be able to complete his sex offender treatment within the requested period. On average, the requirements of sex offender treatment take approximately 1-2 years to complete.  His sex offender treatment,

21
22
23
24
25
26

---

[83] *Henderson*, 649 F.3d at 965.

[84] *Commission Child Pornography Report* at 311-31.

[85] *Grober*, 624 F.3d at 597.

[86] *Id.* at 964.

[87] 18 U.S.C. § 3553(a).

therefore, will be comfortably completed in the term requested. The same is true of substance abuse and mental health treatment.

The other special conditions requested by probation appear to be primarily aimed at ensuring the safety of the community. Ten years is a sufficient period of time for Mr. Derringer to demonstrate to the Court that he poses no continuing threat to the community. Indeed, as the Court is well aware, should Mr. Derringer ever violate his conditions of supervision, the Court can opt then to extend his period of supervision. The Court should not now, prophylactically, apply a term of supervision that the facts of the case do not indicate is necessary. This is Mr. Derringer's first and only serious criminal offense and there are no case related aggravators that indicate a term of supervision longer than 10 years is necessary.

Finally, there are significant other collateral consequences of Mr. Derringer's conviction that ensure the safety of the community beyond the expiration of any term of supervision in this case. For example, as discussed in the plea agreement, Mr. Derringer is subject to SORNA and will have to register where he lives and where he is employed for 25 years.[88] That requirement, like many other collateral consequences of the conviction in this case, attaches for a significant period of time, regardless of the period of supervision this Court imposes.

Finally, the requested term of supervision is precisely the median term in the Ninth Circuit for individuals convicted of child pornography offenses and in criminal history category I (120 months).[89] Indeed, the median term of supervision

---

[88] *See* ECF No. 32 at 6; 34 U.S.C. § 20901.

[89] United States Sentencing Commission Interactive Data Analyzer, *available at* https://ida.ussc.gov/analytics/saw.dll?Dashboard (searching for child pornography sentencing outcomes for individuals in criminal history category I in the Ninth Circuit).

24

across all circuits for child pornography offenders in criminal history category I is 120 months.[90] The requested term of supervision is therefore in line with the periods of supervision imposed in this circuit and nationally for similarly situated individuals.

### III.   THIS COURT SHOULD NOT IMPOSE PROBATION'S SUGGESTED SPECIAL CONDITIONS 1, 3, 7, 8, AND 9 OF SUPERVISED RELEASE.

Besides the standard and mandatory conditions of supervised release, the district court may impose additional conditions of release.[91]   Those special conditions must (1) be reasonably related to the goals of deterrence, protection of the public, and/or defendant rehabilitation; (2) involve no greater deprivation of liberty than is reasonably necessary to achieve those goals; and (3) be consistent with any pertinent policy statements issued by the Sentencing Commission.[92]

Important here, Mr. Derringer objects to Probation's proposed Special Conditions 1, 3, 7, 8, and 9 as unconstitutional and fail to meet the requirements of 18 U.S.C. § 3583(d).  Mr. Derringer asks that the Court decline to impose those conditions.

#### 1.   Special Conditions No. 1, 3 and 8:  Substance Abuse, Mental Health, and Sex Offender Treatments.

Special conditions 1, 3, and 8 recommends substance abuse, mental health, and sex offender treatments.  The conditions state: [t]he probation officer will supervise your participation in the program (provider, location, modality, duration,

---

[90] *Id.* (searching for child pornography sentencing outcomes for individuals in criminal history category I nationwide).

[91] 18 U.S.C. § 3583(d).

[92] *United States v. Napulou*, 593 F.3d 1041, 1044-45 (9th Cir. 2010).

intensity, etc).”[93]   Mr. Derringer objects to these conditions as an unlawful delegation of power to the PO to determine the length of treatment.   Mr. Derringer request these conditions be modified to say that “You must participate in an outpatient … program and follow the rules and regulations of that program until the treatment provider determines that the treatment is completed or there is a discharge summary.”  Such language cures the unlawful delegation of power of the PO to determine the length of treatment.

## 2.     Special Condition No. 7:  No Pornography

First, the Court should not impose the blanket “no pornography” special condition proposed by Probation. The proposed condition would ban Mr. Derringer from accessing adult pornography—a constitutionally protected interest. And there is no sign that access to adult pornography contributed (for instance) to the offense here. So the condition should not be imposed.

To begin, this proposed condition implicates a significant liberty interest.[94] “Adult pornography, unlike child pornography, enjoys First Amendment protection, and so [courts] must be especially cautious when considering a ban on possessing adult pornography.”[95]

Courts therefore impose conditions touching on adult pornography only in limited circumstances. They ordinarily only do so where the evidence shows that access to adult pornography “could cause the defendant to revert to accessing child pornography.”[96] Limitations may also be permissible where there is a documented

---

[93] PSR at 24-25, Special Conditions 1, 3, and 8.

[94] *Wolf Child*, 699 F.3d at 1092.

[95] *United States v. Shannon*, 743 F.3d 496, 500 (7th Cir. 2014); *see also United States v. Gnirke*, 775 F.3d 1155, 1163 (9th Cir. 2015) (recognizing that a similar prohibition “unquestionably implicates” the First Amendment).

[96] *United States v. Van Donk*, 961 F.3d 314, 322 (4th Cir. 2020) (citing *United States v. Brigham*, 569 F.3d 220, 232–34 (5th Cir. 2009)).

"connection between pornography and [the defendant's] criminal behavior."[97]  And bans may be allowable if they are helpful in addressing "the defendant's deviant sexual behavior."[98]

"In contrast, appellate courts have struck down such conditions when they were unaccompanied by individualized explanations for their broad sweep."[99]  The government (and Probation) cannot supply a generic explanation or simply assert that an adult pornography ban is "a standard condition for sex offenders."[100]  Rather, the government must provide "individualized evidence linking pornography" to the defendant's "criminal conduct or rehabilitation and recidivation risk."[101]  These limitations thus require "detailed factual findings" establishing their necessity given the relevant sentencing factors.[102]

Against this backdrop, a blanket "no pornography" condition is unnecessary here. Nothing in the PSR suggests that adult pornography "may . . . influence" Mr. Derringer's behavior in any individualized way.[103]  And the absence of any "indication in the record that [Mr. Derringer] has an unhealthy relationship with

---

[97] *Id.* at 322–23 (citing *United States v. Simmons*, 343 F.3d 72, 81–83 (2d Cir. 2003)).

[98] *Id.* at 323 (citing *United States v. Bee*, 162 F.3d 1232, 1234–35 (9th Cir. 1998)).

[99] *Van Donk*, 961 F.3d at 323.

[100] *Id.* at 323 (cleaned up) (collecting cases)

[101] *United States v. Ellis*, 984 F.3d 1092, 1099 (4th Cir. 2021).

[102] *United States v. Eaglin*, 913 F.3d 88, 99 (2d Cir. 2019).

[103] *Ellis*, 984 F.3d at 1099; *see also United States v. Taylor*, 796 F.3d 788, 793 (7th Cir. 2015) (striking down a similar condition because there was no evidence "that viewing or listening to adult pornography would make the repeat of [the defendant's] crime or similar crimes any more likely").

27

such materials or that such materials contributed to his underlying crimes or other violations" further confirms this condition is unnecessary.[104]

Mr. Derringer will be subject to computer search and monitoring conditions.[105] He will also be subject to various forms of physical searches a normal person is not subjected to. These conditions will appropriately guard against Mr. Derringer accessing improper materials online. But, on this record, a no-pornography condition is unwarranted. The Court should not impose it.

### 3.   Special Condition No. 9: Polygraph Testing

Special Condition No. 9 requires Mr. Derringer to submit to periodic polygraph testing at the discretion of the probation officer. . . ."[106] This condition is not reasonably necessary to meet the goals of Mr. Derringer's supervised release, and thus, should be omitted.  Polygraph examination is an inherently unreliable method of testing, and therefore, cannot reasonably ensure compliance with supervision conditions or treatment. *United States v. Blakley*, Case No. 2:18-cr-00045-JCM-DJA, *see* ECF No. 82 (this Court sustaining the defense's objection to the polygraph testing condition and not imposing it); *United States v. Baker*, 3:23-00025-ART-CLB (Judge Traum did not impose the polygraph testing condition).

Polygraph evidence has long been disfavored in federal court. *Toussaint v. McCarthy*, 918 F.2d 752 (9th Cir. 1990). Given the unresolved problems inherent in polygraph and other truth verification procedures, requiring Mr. Derringer to undergo such procedures subjects him to the risk of a significant deprivation of liberty based on unreliable and untrustworthy results.

---

[104] *United States v. Salazar*, 743 F.3d 445, 452 (5th Cir. 2014); *see also United States v. Voelker*, 489 F.3d 139, 151 (3d Cir. 2007) (similar).

[105] PSR p. 26.

[106] PSR at 26, ¶ 9.

28

1    IV.    **CONCLUSION**

2           For the reasons set forth above, Mr. Derringer respectfully requests the

3    Court sentence him to 60-months as it is sufficient but not greater than necessary

4    under the sentencing factors in 18 U.S.C. § 3553(a).   Further, Mr. Derringer

5    requests his sentence be followed by a 10-year term of supervised release.

6           DATED this 23rd day of September 2024.

7                                     Respectfully submitted,

8                                     RENE L. VALLADARES
                                      Federal Public Defender
9

10                                    */s/ Nisha Brooks-Whittington*

11                                    NISHA BROOKS-WHITTINGTON
                                      Assistant Federal Public Defender
12                                    Attorney for Alexander Scott Derringer

13

14

15

16

17

18

19

20

21

22

23

24

25

26

29